## In re Estate of Kusar.

(No. 665428.   Decided November 2, 1965.)

*Mr. Andrew Pangrace*, for exceptors.
*Mr. Michael A. Picciano* and *Mr. Alan Meltzer*, for administratrix.

BARTUNEK, J.   This matter comes before the court upon the filing of certain exceptions to the inventory and appraisement of the estate of Ignac Kusar, deceased.   The inventory contains a parcel of real estate and personal effects of the deceased. The exceptors claim that the real estate should not be listed as an asset of the estate and further claim that a bank account

and a savings and loan account should be included as assets of the estate.

The evidence fairly discloses the following:

In 1915, Ignac and Lucille Kusar, husband and wife, purchased a two-family house and a cottage-like dwelling located on Goller Avenue in the city of Euclid. At that time, each acquired an undivided one-half interest in the property.

The Kusars lived on the premises and raised a family of four boys and one girl. On July 2, 1938, in her last illness, Lucille Kusar executed a last will and testament, devising her undivided one-half interest in the Goller Avenue property to her five children, share and share alike, and directing that her husband, Ignac, "* * * be permitted to reside in the house while unmarried * * *."

The will was properly signed before two witnesses, one being attorney Paul H. Torbet, who drafted the will. Also present in the room at the time of the signing were her husband Ignac Kusar, daughter Mary Kusar (later Mary Sopko), and sons John and Joseph Kusar.

Three days later, on July 5, 1938, Lucille Kusar died.

Following the death of Lucille Kusar, no attempt was made to probate her will and it is not clear who had possession of it. It is known, however, that attorney Torbet had possession of the will in 1941 and was, at that time, specifically directed by Ignac Kusar not to probate the will.

On August 26, 1942, in contemplation of his second marriage, Ignac Kusar entered into a contract with all five of his children. Within the contract, it was recited that Lucille Kusar had executed a will which had not been offered for probate, but which devised to her children all her undivided one-half interest in the Goller Avenue property and recited further that the father, Ignac, could claim an interest in this property as surviving spouse "* * * if and when it (the will) is admitted to probate * * *." One of the children, Frank Kusar, did not sign the contract.

In the body of the contract, Ignac Kusar agreed to execute a quitclaim deed conveying to his children, John, Joseph, Frank, and Mary, all his right, title, and interest in the Goller Avenue property and acknowledged giving James an undetermined amount of money in lieu of an interest in the property. Speci-

fically included in the contract was the relinquishment of an interest Ignac Kusar stated "I might claim" in the estate of Lucille Kusar. In the contract, Ignac retained the exclusive right to maintain, manage, and conduct the household "as heretofore" and agreed to be responsible for the payment of all taxes and maintenance. The children retained the right to reside on the premises "as they have in the past."

The final clause of the contract set forth:

"Be it further provided however, that in the event that the said Ignac Kusar does marry as intended and shall thereafter become separated from his wife by reason of death or divorce, then this contract shall be at an end, and Second Parties (the Kusar children) agree on behalf of themselves, their heirs, administrators and assigns, on demand of said First Party (Ignac Kusar), that they will reconvey the said undivided one-half interest subject of conveyance under this contract, and he shall otherwise be restored to and shall enjoy all rights in and to all of the said property at * * * Goller Avenue * * * which legally belonged to him or could belong to him prior to the execution of this agreement."

Another paragraph in the contract was:

"It is further provided that so long as this contract is in effect and Ignac Kusar resides upon the premises, Second Parties (the Kusar children) agree in the event that he becomes ill and is unable to work and needs assistance that they will jointly contribute whatever sum is necessary to pay all of his hospital and medical expenses and they further agree in the event he shall ever be in need to furnish him with proper food and clothing and funds sufficient to enable him to live as he has been accustomed to live."

On the same day, August 26, 1942, a quitclaim deed to John, Joseph, Frank, and Mary Kusar was signed by Ignac and was recorded on August 27, 1942. Subsequently, within a few weeks, the words, "sons and daughter of the above grantor," were inserted after the names of the Kusar children, apparently to eliminate any possible confusion between Mary Kusar, the daughter of Ignac, and Mary Kusar, the intended wife of Ignac, and the deed was rerecorded on September 16, 1942. Possession of the deed however remained in the hands of Ignac Kusar.

On September 19, 1942, Ignac married Mary Brule, who is now the administratrix herein and the surviving spouse of Ignac. James Kusar, son of Lucille and Ignac Kusar, who had received cash in lieu of an interest in the Goller Avenue property, but who was a devisee under the unprobated will of Lucille, died on April 5, 1953.

In 1953, Ignac Kusar became ill and was confined to a hospital. During that period of time, his second wife, Mary, apparently discovered the quitclaim deed giving to his children all his right, title, and interest in the Goller Avenue property. As a result of that discovery, certain discussions evolved in the preparation of an agreement by attorney Paul Torbet. The agreement was between the four living children of Ignac and Mary Kusar, Ignac's second wife. In the agreement, it was recited that the children were the "owners in fee simple" of the Goller Avenue property, and it was proposed that Mary Kusar, the second wife, would be permitted to live in the upstairs suite of the two-family house rent-free for a period of one year after the death of Ignac unless she should remarry. It was also proposed that she would release any claims or right she might have against the property.

On April 1, 1954, the four surviving Kusar children signed the agreement but Mary Kusar, the second wife, refused to do so. Ignac Kusar was one of the two witnesses to the signatures of his children.

On July 7, 1954, Ignac Kusar, in the presence of two witnesses, signed a "statement" in which he acknowledged that his sons Joseph and Frank "made large financial contributions toward the purchase" of the Goller Avenue property and further acknowledged that the property was conveyed by deed dated August 26, 1942, to John, Joseph, and Frank Kusar, and Mark Kusar Sopko. He went on to state that Joseph and Frank should share equally in the property, but that John and daughter Mary shall each receive $1,000 after which they would have no further interest in the property "other than such interest as may come to them under the will of 'their mother.'" The will of "their mother," as yet, 16 years after her decease, had still not been probated.

Following the signing of this "statement," Ignac Kusar continued to live on the Goller Avenue property with his

second wife, Mary. He still retained all the indicia of owner-ship, including the payment of taxes, collection of rents, paying for the maintenance of the property, and otherwise taking care of the property as a fee-simple titleholder. He collected rent from Mary Kusar Sopko, his married daughter in 1947 and from March 15, 1960, to April 1, 1963, he collected rent from his son, Joseph Kusar. And during all this period of time, he retained the 1942 deed in his possession and refused to probate the will of his first wife, Lucille Kusar.

Ignac and his second wife, Mary, on October 31, 1952, opened a joint and survivorship saving account at a Cleveland Trust Bank, and on January 7, 1955, opened another joint and survivorship savings account at the St. Clair Savings & Loan Association. On December 31, 1957, Ignac's son, Frank Kusar, died. On March 14, 1963, Ignac Kusar's second wife, Mary, withdrew all the funds from the joint and survivorship savings account at the Cleveland Trust and the joint and survivorship savings account at the St. Clair Savings & Loan Association.

On April 3, 1963, Ignac Kusar, husband and father, died without a will.

Shortly thereafter, on May 1, 1963, the will of Lucille Kusar, first wife of Ignac Kusar, was offered for probate by her son Joseph. At this time, Lucille had been dead for nearly 25 years. On June 5, 1963, taking due note of its age, this court admitted Lucille's will to probate.

Pursuant to Section 2113.61, Revised Code, on April 28, 1964, a certificate of transfer of real estate was issued trans-ferring Lucille Kusar's 1938 one-half undivided interest in the Goller Avenue property to her five children, or their heirs, one-fifth of the property to go to each, two of the children now being deceased. The transfer was duly recorded on May 8, 1964.

Immediately thereafter, the son Joseph Kusar, began to acquire complete title to the property through a series of trans-fers from his brothers, sister, and the heirs of his deceased brothers. From June 1964, to and including November 1964, a number of quitclaim deeds apparently transferred all the in-terests of the Kusar children and their heirs in the Goller Avenue property to Joseph Kusar. And, on November 6, 1964, Joseph Kusar demised to Carolyn Kusar, his wife, by quitclaim

deed, one-half of whatever interest he had in the Goller Avenue property.

Mary, the second wife of Ignac Kusar, on November 18, 1964, filed an application for letters of administration in the estate of Ignac Kusar, claiming that the estate should contain the entire interest in the property located on Goller Avenue. Subsequently, letters of administration were granted and the inventory and appraisement later filed listed the assets of the estate as being the real estate on Goller Avenue and some personal effects of the deceased. The exceptions to the inventory and appraisement challenging the inclusion of the real estate and complaining about the failure to include the joint and survivorship accounts were filed.

The pleadings, the evidence, and the briefs of the parties present several questions which must be determined by this court. These questions are:

1. Did the one-half interest in the Goller Avenue property owned by Lucille Kusar at the time of her death in 1938 descend according to her will, or was it diverted otherwise by a failure to have it probated within three years under Section 2107.10, Revised Code?

2. Was the one-half interest in the Goller Avenue property owned by Ignac Kusar transferred to four of his five children by virtue of the agreement and the deed of 1942, or was this transfer void because of the failure of delivery of the deed or the absence of some other element necessary to effect a transfer of real estate, or because such a transfer made in contemplation of marriage was a fraud upon the rights of his intended wife?

3. Were the joint and survivorship accounts property belonging to Ignac Kusar at the time of the death which should have been included in the inventory and appraisement of his estate?

Lucille Kusar, by her last will and testament, devised her entire one-half interest in the Goller Avenue property to her five children. Although her husband, Ignac, was not given any inheritance under the will, except a right to live in the premises until remarried, since he was deceased at the time of the probate of that will, his right to an election to take

under the statute of descent and distribution did not exist and he and his estate were effectively disinherited thereby.

Lucille's interest in the property, therefore, would descend to her children, unless these children, or any of them, had forfeited their rights by virtue of certain actions which would bring them, or any one of them, within the purview of Section 2107.10, Revised Code.

Section 2107.10, Revised Code, in effect at the time of the probate of Lucille's will, substantially the same as its predecessor statute, Section 10504-14, General Code, in effect at the time of Lucille's death, provides:

"No property or right, testate or intestate, shall pass to a beneficiary named in a will who knows of the existence of such will for three years and has the power to control it, and, without reasonable cause, intentionally conceals or withholds it or neglects or refuses within such three years to cause it to be offered for or admitted to probate. The estate devised to such devisee shall descend to the heirs of the testator, not including any heir who has concealed or withheld the will."

Children John, Joseph, and Mary Kusar, and husband Ignac were present at the execution of the will in 1938. Children John, Joseph, James, and Mary, and husband Ignac all signed a contract in 1942 referring to the existence of the will. Of all of Lucille Kusar's family then, only son Frank has not been shown to have known of the existence of the will for more than three years prior to the probate of said will. And it can fairly be inferred that Frank, too, knew of the will, inasmuch as his name, pursuant to the 1942 contract, appeared as a grantee in the deed dated 1942.

Mere knowledge of an existence of a will, however, is not sufficient to bar the beneficiaries from their devise. This rule of law is set forth in *Stillwell, Admx.,* v. *Tudor,* 80 Ohio App. 190, *Mitchell* v. *Long,* 9 N. P. (N. S.) 113 and *Lawrence, Gdn.,* v. *Woodcox, Admx.,* 16 Ohio Law Abs. 129. It is best expressed in *Hoskins, Admrx.,* v. *Lentz,* 23 Ohio Law Abs., 5, a 1936 case which held that a beneficiary under a will who fails to cause such will to be offered for probate within three years after knowing of its existence, is not, by virtue of Section 10504-14, General Code (Section 2107.10, Revised Code), deprived of his

legacy or devise unless his withholding or neglect or concealment or refusal to cause it to be offered for probate is intentional and without reasonable cause, for the purpose of delaying its administration or defeating some rights or benefits given by the terms of the will.''

Therefore, there must be something more than knowledge of the existence of a will as was found in *Lawson* v. *Thomas*, 48 Ohio App. 311, where it was held that knowledge and possession of the will coupled with opportunity for more than three years after testator's death to probate it acted as a bar to the beneficiaries. And in *In re Estate of Varley*, 37 Ohio Law Abs. 275, it was held that access to the will along with exclusive control of it within three years after a life tenant's death amounted to an intentional withholding and a neglect to bring the remainderman within the punitive provisions of the statute.

Being a penalty statute and thus requiring a strict construction, it then becomes necessary to show that any of the children sought to be brought under the forfeiture provisions, in addition to having known about the will for more than three years after the death of the testatrix, must have had the power to control the will and must not have had reasonable cause to withhold it or to neglect to probate it.

The Kusar children, in their brief, place much emphasis on the allegation that they had reasonable cause to withhold the will. If they had such reasonable cause, it has not been so demonstrated to the court. This court believes that the Kusar children had no reasonable cause to refuse to probate the will, but we further believe that the Kusar children did not have the power to control the will in order to offer it for probate.

It is not known where the will was from 1938 to 1941. But it is known that attorney Torbet began to commence proceedings to probate it in 1941 and that he was specifically prohibited from so doing by Ignac Kusar, the father of these devisees. Since these children did not have the will and since the attorney who did have possession of the will was prohibited from probating it by Ignac Kusar, where then did the children have the power to control the will?

Arguments might be advanced that the children, thus being frustrated by the act of their father, could then resort to court action to compel the production of the will and the instigation

of probate proceedings. This we cannot consider as being the duty of the children under these circumstances. It would not be proper for a court to expect children to defy the wishes and expressed command of their father in order to accelerate their ownership in their mother's property. It would not be in accordance with the principles of equity. And this court is well grounded in considering principles of equity in this matter, according to *Ramsdell* v. *Bonser*, 34 Ohio Law Abs. 49, a 1936 case, which held:

"The court is justified in applying equitable principles in considering the evidence in a case involving the question as to whether devisees under a will are within the purview of Section 10504-14, General Code (Section 2107.10, Revised Code), in view of the severe penalty attaching by reason of the forfeiture ensuing when devisees are brought within the purview of such section."

This is a case where a father, who had the full confidence of his children, decided upon a course of conduct best suited, in his opinion, to the interests of his family. His children, because of their love and respect for him, acceded to his wishes. And for thus demonstrating their love and respect for their sire, this court is not going to penalize them.

A similar case involving a mother who had confidence in her son was considered in *Lawrence, Gdn.,* v. *Woodcox, Admx.,* 16 Ohio Law Abs 129, a 1933 case, and in its opinion, the court, on page 130, said:

"The evidence discloses that Emma J. Woodcox did have knowledge of the will of her husband and the extent to which she was benefitted thereby. She did have, no doubt, the power to do something which would have enabled the Probate Court to have required the will to be probated. But it is also highly probable that her son, Ray H. Woodcox, was the controlling factor in the failure to probate the will sooner. This is but reasonable inasmuch as his mother had no cause, insofar as the provisions of the will were concerned, to withhold it from record. On the contrary, she had every reason, being its sole beneficiary, to see that it was probated. Her conduct, therefore, would seem to be explained for some other reason and probably because of her affection for her son. His interest would be advantaged by keeping the will from probate."

Having given full consideration to the evidence, this court finds that the acts of the Kusar children Joseph, John, James, Frank, and Mary, do not bring them within the purview of Section 2107.10, Revised Code, so as to work a forfeiture against them and therefore finds that these children are entitled to and do inherit the one-half interest in the Goller Avenue property owned by their mother, Lucille, and devised to them under her will.

In 1942, in contemplation of marriage, Ignac Kusar executed a quitclaim deed transferring his interests in the Goller Avenue property to four of his five children, and reserving by contract certain rights of management of the property, rights of reconveyance under certain circumstances and imposing a duty of support on all five of his children. The deed was recorded and then rerecorded.

It is well settled in Ohio that in order for a deed to be effective to transfer land it must be executed, acknowledged, and delivered. Further, there must be an intention on the part of the grantor to severe himself from the ownership of the property and there must be an acceptance of the property on the part of the grantee.

The fact that the deed herein was properly executed and acknowledged is not challenged. Nor is it questioned that the deed was properly recorded. What then is the effect of recording a properly executed and acknowledged deed.

In 1854, *Lessee of Mitchell* v. *Ryan*, 3 Ohio St. 377, held:

"When a man executes and acknowledges a deed and delivers it to the recorder, with unqualified instructions to record it, the reasonable presumption, in the absence of any rebutting circumstance, is, that he means to part with his title.

"The fact of a grantor's possession of a deed, after an alleged delivery of it, may be a very pregnant circumstance to show that the supposed delivery was not absolute. But such possession of a recorded deed is entitled to much less consideration than the possession of a deed not recorded.

"Clear proof ought to be made to warrant a court in holding that a man, who has executed and acknowledged a deed, and caused it to be recorded, did not mean thereby to part with his title."

Applying this reasoning to the instant case, it would seem

that the recording and rerecording of the deed indicates that all the elements required to be shown for a good transfer have been shown and that it would now require proof of some substance to set aside the presumption that a valid transfer of the property was effected in 1942.

The fact that Ignac Kusar retained physical possession of the deed has been urged upon us as a circumstance that indicates an imperfect transfer, but this is not so. *Dukes* v. *Spangler*, 35 Ohio St. 119, an 1878 case, held:

"Although there may have been no manual delivery of a deed, nor anything said, in terms, about its delivery, yet the fact of delivery may be found from the acts of the parties preceding, attending, and subsequent to the signing, sealing, and acknowledgment of the instrument."

And, *Lessee of Shirley* v. *Ayres*, 14 Ohio 307, an 1846 case, held:

"It is not essential to the validity of a deed, that it be actually delivered to, or ever pass into the hands of the, grantee."

Other cases brought to our attention have no application to this instant matter. *Pierce* v. *White*, 10 Dec. Rep. 552, is based upon the fact that there was no acceptance of the deed; *Hale* v. *Hale*, 31 Ohio Law Abs. 299, was so decided because the deed was not recorded; *Smith* v. *Ranck*, 80 N. E. 2d 631, had the grantor himself testifying that there was no intention of transferring the property until after his death; *Hinchey* v. *Seldon*, 17 Ohio App. 447, was determined on a basis of failure of proof of delivery and a lack of intention to transfer the property; *Kniebbe* v. *Wade*, 161 Ohio St. 294, dealt with unrecorded deeds that were to take effect at the death of the parties; *Adams* v. *Adams*, 107 Ohio App. 1, set aside the deed because it was unrecorded and delivered with specific instructions not to record; and *Steele* v. *Lowry*, 4 Ohio 72, bears no relation to the facts in this matter.

In the case before us, the intention of the parties is quite clear.

There was an intention to transfer the title to the Ignac Kusar share of the property in 1942, as well as an intention to give certain rights to the use of the property to Ignac, the grantor. Ignac's intention has been plainly shown by the agree-

ment signed in 1942 and clearly reiterated by the "statement" he signed in 1954.

The evidence shows that this man was giving up the security he had labored so hard to obtain. He fully believed that he was making an effective present transfer of his interests in the Goller Avenue property in 1942. This state of mind is certainly indicated when Ignac caused the last paragraph to be inserted in the agreement requiring his children to care for him and to provide financial assistance should he become ill or otherwise be unable to care for himself.

The fact that he continued to occupy the property as he had occupied it before he signed the deed lends no special significance to these proceedings. He merely exercised the rights he had preserved in the agreement for himself and this in no way destroys the transfer which he intended to take place and which he believed did take place in 1942.

This was the belief and the understanding of his children as well. They contributed substantial sums to the upkeep of the property and they provided nursing service and medical attention for their father as he lay in the hospital in his last illness.

These circumstances clearly show all the elements necessary to effectively transfer an interest in property by deed and the court does hereby find that this transfer was valid and binding upon the parties.

What, however, about the effect of the making of a transfer of an interest in property in anticipation of marriage? Did this act as such a fraud on the rights of the intended second Mrs. Kusar so as to set aside an otherwise valid transfer of an interest in realty?

Testimony was to the effect that the second Mrs. Kusar knew and did not know about the transfer of the Goller Avenue property prior to her marriage. Whatever the situation was in 1942, it is certainly clear that the second Mrs. Kusar did know about the deed in 1953. And, after family discussions about the 1942 deed and agreement, and, after she refused to sign the 1954 agreement as to the ownership of the property, and, after Ignac Kusar issued his 1954 "statement" reiterating his intentions and his understanding as related to the ownership of the property, it is significant to note that Ignac opened a

second joint and survivorship savings account with his wife in the amount of $6,555.63, well exceeding the amount of the value of Ignac's widow's share of Ignac's interest in the Goller Avenue property, if indeed she had one, at the time of Ignac's death. And it is interesting for this court to note that the second Mrs. Kusar, while her husband lay dying in the hospital, made haste to close out the joint and survivorship accounts, transferring the amount of $8,797.95 to her sole ownership, while the Kusar children were paying the expenses and the costs of their father's, her husband's, last illness.

It is not as if Ignac Kusar left his second wife penniless and without adequate funds to care for her in lieu of a widow's allowance and year's support. He left her well provided for. And it is not as if he tried to deceive her as to her rights in the real estate, because, regardless of what she knew in 1942, she did know in 1954 that the Goller Avenue property belonged to the children. And so it does seem just and proper to the court that the second Mrs. Kusar cannot now claim any interest in the Goller Avenue property which was transferred out of her husband's name before this marriage was consummated.

But the second Mrs. Kusar called to our attention *Ward* v. *Ward*, 63 Ohio St. 125, a 1900 case which held:

"A conveyance by a man who has entered into a contract of marriage, which subsequently takes place, of a portion of his land to his sons by a former marriage, without consideration other than love and affection, and without the knowledge or consent of his contemplated wife, is a fraud on her marital rights, and she, at his death, is entitled to dower therein."

We believe that this case is distinguished from the instant matter since in that case the deeds were not recorded until after the death of the grantor, the wife had no knowledge of the deeds until after the husband's death, and the decision was made prior to the 1932 revision of the Ohio Probate Code.

More to the point, we believe, is the 1943 decision in *Dick, Admx.*, v. *Bauman*, 73 Ohio App. 107, where the court held:

"The Probate Code Act of 1932 placed no new restraints upon the rights of one in life to dispose of his property, and preserved to the surviving spouse only a vested dower estate in any lands conveyed during the marriage in which such survivor had not relinquished or been barred of dower.

"A widow is not entitled to have set aside as a fraud upon her rights a conveyance of real estate made by her husband to his children without consideration even though he left no provision from which she could receive the exemptions provided for in Section 10509-54, General Code (Section 2115.13, Revised Code), or the year's support mentioned in Section 10509-74, General Code (Section 2117.20, Revised Code).

The following cases, dealing with personal property, *MacLean* v. *J. S. MacLean Co.*, 71 Ohio Law Abs. 589, *Purcell* v. *Cleveland Trust Co.*, 94 Ohio Law Abs. 455, and the leading case of *Smyth* v. *Cleveland Trust Co.*, 172 Ohio St. 489 [overruling *Bolles* v. *Toledo Trust Co., Exr.*, 144 Ohio St. 195 and *Harris* v. *Harris, a Minor*, 147 Ohio St. 437, and approving and following *Cleveland Trust Co., Trustee*, v. *White*, 134 Ohio St. 1, and *Schofield, Trustee*, v. *Cleveland Trust Co.*, 135 Ohio St 328] seem to indicate that the present law of Ohio permits a husband, even during his marriage, to make a disposition of his personal property during his lifetime by gift as he may wish, even though his widow is thereby deprived of her distributive share therein. And if the rights of a widow can be so defeated within the sacred precincts of the marriage state, certainly a man about to enter into a marriage can successfully divest himself of ownership in real estate without being considered to be defrauding his intended wife. We like to think that the second Kusar marriage was entered into because of the love of these two people and not because the second Mrs. Kusar thought that she was acquiring the fruits of the work and labor and love of an earlier marriage. And to now say that the distribution of these fruits to the products of the love of the first marriage (*i. e.*, the children) is void would seem to us to be against public policy, as well as unjust and inequitable.

Therefore, it is our decision that the conveyance of Ignac Kusar's share of the Goller Avenue property prior to his second marriage did not operate as a fraud against his intended wife and the said conveyance, being otherwise valid, cannot be set aside on that ground.

The last question in this case is the ownership of the two joint and survivorship savings accounts. This question has already been ruled upon during the trial, but for the sake of completeness of this opinion, we reiterate that since these ac-

counts were in fact closed out prior to the death of Ignac Kusar and since absolutely no evidence whatsoever has been introduced or been even claimed to show that these accounts were anything but what they purported to be, that is joint and survivorship savings accounts of husband and wife, we do find that the accounts do not properly belong in the inventory and appraisement of the estate of Ignac Kusar, deceased.

In conclusion, then, it is our finding:

1. The undivided one-half interest in the Goller Avenue property owned by Lucille Kusar at the time of her death in 1938 was devised by the terms of her will to her five children, John, Joseph, James, Frank, and Mary.

2. The undivided one-half interest in the Goller Avenue property owned by Ignac Kusar in 1942 was transferred at that time, to his four children, John, Joseph, Frank and Mary, by virtue of the deed executed on August 26, 1942.

3. The joint and survivorship savings accounts owned by Ignac and Mary Kusar (the second Mrs. Kusar) during Ignac's lifetime are not a part of the estate of Ignac Kusar.

The exceptions to the inclusion of the Goller Avenue property in the inventory and appraisement of the estate of Ignac Kusar are well taken and allowed and the property is hereby ordered to be stricken from the inventory and appraisement.

The exceptions to the failure to include the joint and survivorship accounts owned by Ignac Kusar and Mary Kusar (the second Mrs. Kusar) during the lifetime of Ignac Kusar are not well taken and are hereby denied.

*Judgment accordingly.*